**Doe ex dem. VICKERY, plaintiff in error, vs. ROE and BENSON, tenant in possession, defendant in error.**

[1.] The certificate of a clerk to a copy deed offered in evidence, was in this form: The within and foregoing writing is a true copy of a deed made by B. to T. on record in my office in book R. R., page 75.

*Held,* That the certificate was sufficient to render the copy admissible.

[2.] There were interlineations in the certificate, but they were in the same ink and handwriting as the interlined writing.

*Held,* That this did not so vitiate the certificate as to make it inadmissible.

[3.] Although one holds another's land adversely for seven years, under color of title and claim of right, yet if he then *abandons* the land he cannot claim the benefit of the statute of limitations.

[4.] A grant was issued to L. B. in 1788. Subsequently, nothing was heard of him, or of any heir of his, or of any will made by him.

*Held,* That by 1854, it was to be presumed, that he was dead, and, that the land had escheated to the State, on due inquest; and further *held,* that if this inquest was one happening before the escheat Act of 1801, the land was subject, at any time after the inquest, to be regranted by the State, under the Head Rights laws; if one happening after that Act, the land was not so subject, that Act requiring the escheator, to sell and convey the land himself.

Ejectment, and motion for new trial, in Hart Superior Court. Before Judge JAMES THOMAS, October Term, 1858.

This was ejectment by Doe & Joseph Vickery, against Roe casual executor, and John B. Benson, tenant in possession, for a tract or parcel of land, situated in the county of Hart.

Upon the trial, plaintiff introduced in evidence a grant from the State of Georgia, to Joseph Vickery, the lessor, for the land in dispute, dated 2d August, 1854; proved possession by defendant at the commencement of the suit, and closed.

Defendant submitted and offered in evidence the grants, deeds and copy deeds, under which he claimed, of which the following is an abstract, viz:

A grant from the State to Lamentation Braswell, dated 17th February 1788, and proved that this grant covered the land in dispute.

Copy deed from R. Middleton, Sheriff, to Isaac Bull, dated 4th March, 1806; admitted as color of title.

Copy deed from Bull to George Turman, dated 29th October, 1814, admitted as color of title.

Copy deed from Sam. Turman, administrator of George Turman, to William Pulliam, dated 10th November, 1832; admitted as color of title, conveying one moiety of the land included in the grant to Braswell.

A deed from Matthew Pulliam to William, dated 3d January, 1839.

A deed from Thomas J. Turman and James M. Sandrige, administrators of Parmelia Pulliam, to Eustin Fortson, dated 1st December, 1846.

Copy of the last will and testament of Eustin Fortson, and letters testamentary to his executors, dated 1st September, 1851.

Deed from Thomas J. Fortson, to John W. Smith, dated 5th November, 1853.

Deed from John W. Smith to defendant Benson, dated 19th December, 1854.

Deed from George G. Fortson to Dyer and Vickery, dated 5th November, 1853.

Deed from Dyer and Vickery to Burrel Mitchell, dated 12th February, 1855.

Deed from Heely Fortson to John G. McCurry, dated 8th March, 1855; also, a deed from Benjamin Fortson to same; same date.

Relinquishment from John G. Murry to Benson & Mitchell, dated 21st March, 1855.

*James Carpenter* sworn on the part of defendant, testified: That he had known the land from his earliest recollection; first as the Turman, then as the Pulliam tract. Joseph Vickery was living on it prior to 1818; heard Vickery talking to witness' father, when he came to split rails for him, some years before he, witness, moved away, in 1813. Vickery said he held under Turman. On one occasion he said he had a mind to run out some of the land, that he did not believe that Turman's title was good. Witness was then absent from the country till about 1828 or 1830, and on his return Vickery was still living on the land, holding under Pulliam: Pulliam, Vickery and witness were all on the land together, soon after his return to this country. Pulliam proposed to sell to witness, and Vickery showed the lines, and witness expressing doubts of Pulliam's title; Vickery said that the title was good. Two or three years afterwards, Vickery moved off, and said that Pulliam wanted him to do what he would not do. William Pulliam died, leaving no child or children, but a widow, Parmelia, who was the daughter of George Turman, outlived her husband four or five years.

*Samuel B. Sanders* testified: That he had known the land all his life; first as the Bull, then as the Turman, then as the Pulliam, then as the Fortson tract. Joseph Vickery settled on the land many years ago; knows that he was on the land and went off, but cannot recollect the years Vicke-

ry was tenant of Pulliam; he left the land about twenty years ago. In a settlement with Pulliam, witness paid a claim which Pulliam had on Vickery, which Vickery afterwards ratified. Witness was Vickery's agent in the transaction; do'nt know whether the claim was for rent. Pulliam was here occasionally attending to the land; never saw him on the land. A year or two before Vickery moved off, Joel Dyer went on the land and held under Pulliam and cultivated some ten or fifteen years after Vickery left, till he wore out the land. Witness is over fifty years old, and has lived on the adjoining land all his life, and never heard of Lamentation Braswell.

*Calvin P. Sanders*: Has known the land all his life; Vickery was tenant on it under Pulliam; he lived on it a few years, and then moved off, because Pulliam required him to pay rent; the land was first known as Bull's, then as Turman's, then as Pulliam's, then as Eastin Fortson's; was present at Elberton about twenty-five years ago, when Pulliam told Vickery he must move off or pay rent; Vickery said he wanted to stay long enough to get pay for his improvements, but would not pay rent. Two or three years ago, when the lawing began, Vickery admitted to witness that the conversation above stated with Pulliam had occurred, and said, that he was not lawing or contending for the Fortson tract; is about fifty years old; lived in the neighborhood all his life, and never saw or heard of Lamentation Braswell.

*Elias Vickery* testified: That some twenty or twenty-five years ago, witness and his father and his uncle Joseph (the plaintiff,) were on the road to Elbert Court House, when plaintiff said that Pulliam required him to pay rent, and rather than do it, he would move off, which he did in a year or two.

*Lemuel Scott*, for defendant, testified: That the land was said to be Pulliam's, Eastin Fortson bought it. Witness

was at Fortson's and tried to purchase land from him, and Fortson made him his agent by writing; has searched for the writing, but cannot find it; acted as agent from 1846, till a little before Fortson's death, some seven or eight or ten years; thinks not less than five years.

*Thomas J. Thornton*, for defendant, testified: That William Pulliam died about sixteen years ago, leaving his wife, only heir and distributee, who was a daughter of George Turman.

*Van D. Lacy*, proved: That William Pulliam lived about fifteen or sixteen miles from the land, and Fortson about twenty miles from it.

Plaintiff introduced in evidence, the record of the case of *Joseph Vickery vs Rachel Dyer*, tenant in possession; also, the record in the case of *the same vs. Lemuel Scott;* the one to September Term, 1854, the other to September Term, 1855, of Hart Superior Court.

*Daniel M. Johnson,* for plaintiff, swore: That he was fifty-six years old, had always lived in five or six miles of the land in dispute, and never knew or heard of Lamentation Braswell.

*Hugh McLane*, for plaintiff: He had always lived in the neighborhood, and Joel Dyer was sent to the Penitentiary in 1839 or 1840.

*Sanders Dyer* for plaintiff, proved: That his father, Joel Dyer, made about three crops on the land since his earliest recollection, and that he left sixteen or seventeen years ago; at his first recollection, his father was tending the land. Witness is about twenty-eight years old. Rachel Dyer did not live on the land. Witness' father paid Pulliam twelve dollars rent a year; do'nt know how long his father tended the land before his recollection. Lemuel Scott lived where witness' mother, Rachel Dyer, lived and died.

Defendant proved, that the land claimed and sued for in the suits against Rachel Dyer and Lemuel Scott, the records

of which were offered in evidence, was not in the Braswell survey.

Here the testimony closed.

Defendant requested the Court among other things, to charge the jury:

1st. That if the title had passed out of the State by a grant to Lamentation Braswell, prior to plaintiff's grant, then plaintiff cannot recover.

2d. That if the State once granted the land prior to plaintiff's grant, the State had thereby divested itself of all title and could not grant it again, so as to convey a valid title to the last grantee.

3d. That if there was possession of the land for seven years by any person, after the title had once passed out of the State, under color of title and claim of right, prior to this suit, then the jury should find for the defendant.

The Court refused to give in charge the first and second requests, but charged the third. To which plaintiff excepted.

The jury found for the defendant, whereupon plaintiff moved for a new trial, upon the following grounds:

1st, 2d, 3d, and 4th. Because the verdict is contrary to the evidence, and the weight of evidence, to the charge of the Court, and the law.

5th. Because the Court erred in admitting in evidence the copy deed from Isaac Bull to George Turman; the original being the best evidence or its non-production first accounted for, and also, because the Clerk's certificate was insufficient to authenticate said copy, and because of the interlineations therein, which were not explained or accounted for.

6th. Because the Court erred in admitting in evidence the deed from Samuel Turman, adm'r of George Turman, to William Pulliam, the same having been altered.

7th, and 8th. Because the Court erred in its charge to the jury.

9th, and 10th. Because of the improper conduct of one of the jurors who tried the case.  [Said conduct set out in these two grounds.]

The Court overruled the motion for a new trial and plaintiff excepted.

VANDUYSER and THOMAS, for plaintiff in error.

HESTER & AKEMAN, *contra..*

*By the Court.*—BENNING, J. delivering the opinion.

Ought the Court to have granted the motion for a new trial?

I shall begin with the *fifth* ground of the motion.

That ground contained three specifications.  Of these, the first was abandoned, as having been taken by mistake.

The second was, that the Clerk's certificate was, that the copy of Bull's deed to Turman, was a copy of the *deed itself*, and not a transcript from *the record* of deeds.  The certificate was in this form, "that the within and foregoing writing is a true copy of a deed made by Isaac Bull, to George Turman, on record, in my office, in Book R. R. p. 75."

In the loose language of common parlance, it is not unusual to call the record of the deed, the deed itself.  An applicant to the Clerk, for a copy from the record, will say, " give me a copy of such a deed from the record ;" meaning, and being understood to mean, a copy of the record of that deed.

[1.] The Court below thought that, all the circumstances considered, the Clerk used the word, " deed," in this sense of the record of a deed.  And we think so, too.

And even if the deed, and not the record of it, had been what was meant, I myself should still have thought the copy admissible.  Even in that case, the copy would, it is to be

presumed, have been " a copy" or " transcript" of a " document or paper of file," in the office of the Clerk—of file there, for record ; and the Act of 1819, (*Pr. Dig.* 215,) says, that the certificate of any public officer, " shall give sufficient validity to any copy or transcript of any record, document or paper of file, in the respective offices under their control," " to admit the same as evidence."

The third specification was, as follows : " That the certificate of the copy deed was not admissible in evidence because of the interlineations therein, the same not being accounted for, nor explained.

[2.] The interlineations were in the same ink, and the same hand, with the writing interlined. The Court below concluded, therefore, that the interlineations did not vitiate the certificate, and we think that this was a proper conclusion. In such a case, it is to be presumed, that the interlineations or erasures are rightfully made.

We regard then, the fifth ground of the motion as insufficient.

The sixth ground differs in no essential particular, from this third specification of the fifth ground.

The seventh ground was the charge, " that if there was possession of the land for seven years, uninterruptedly, by any person, after the title had once passed out of the State, under color of title and claim of right, prior to" the " suit, the jury" should " find for the defendant."

The eighth ground was the same in substance as this seventh.

And we think it true, that there *was* error in this charge.

[3.] 1st. We think, that even if the title to land is out of the State, yet it does not thence follow, that in every case, seven years adverse possession, under color of title and claim of right, gives a title to the occupant. He may, at or after the seven years, *abandon* the land. If he does so, the previous possession counts for nothing. The abandonment is an admission, that there is a better outstanding title, and, that the

possession was, while it lasted, really, in subordination to that title. It is saying, that the mistake, fraud, or something insufficient, was the cause of the adverse possession and claim of right.

2dly. But it may be, that the title to this land was in the State at the time of the existence of the two possessions proved. And if it was, those possessions could count for nothing, as the statute of limitations does not run against the State.

It does not follow, that because title to land, has once passed out of the State, it can never return into the State. It may revert to the State by escheat, on proper inquest of office. And if it does so revert, and the inquest be of the kind provided by the common law, the effect will be, to cause the title to return into the State, and the land to resume its old condition—the condition it had before it was granted. (3 *Black. Com.* 258.) Being in this condition, it will be subject to be re-granted, in the same way in which, it was granted; as, under the Head Rights Laws, if the first grant was under those laws; and, until so re-granted, it will belong to the State. Consequently, until so re-granted, it will be exempt from the statute of limitations, for that statute does not run against the State.

If, however, the inquest of office be of the kind furnished by the Escheat Act of 1801, the effect will be different. That Act requires the escheator, to sell and convey the escheated land, in the course of some months after the termination of the inquest. When, therefore, the inquest is of this kind, the title, though returning into the State, abides there but a short time; it soon passes out again, through the escheator, into whoever may become the purchaser of the land, at his sale of the land.

And the title having thus passed out of the State, the land will cease to be subject to be re-granted by the State, whether by the Head Rights Laws, or any other, there being no law

authorizing the issue of a grant for land to which the State has no title; and the land having got into private hands, will become subject to be affected by the statute of limitations.

It remains to apply what has thus been said, to the case in hand.

3d. A grant was issued to Lamentation Braswell, in 1788. He has never been heard of since. Nor does it appear, that he made any will, or, left any heir. It is, therefore, to be presumed, that, subsequently, to the grant, he died, and died without a will, or an heir; and, therefore, that the land escheated to the State, on due inquest of office. And it must be true that this inquest was one taken before the Escheat Act of 1801, or, one taken after that Act. If one taken before, then, it must have been an inquest at common law, and must, therefore, have had the effect, to put the title into the State, there to remain until the issuing of the grant to Vickery, in 1854, when it passed out of the State a second time, and entered into Vickery. Consequently, if the inquest was one taken prior to the Escheat Act of 1801, then it must be true; 1st, that the title was in the State at the times of the existence of the possessions proved, and, therefore, that such possessions could not affect it; 2dly, that the grant to Vickery, was good, and conveyed the title into him.

[4.] On the other hand, if the inquest was one taken after the Act of 1801, it is to be presumed, that it was an inquest pursuing that Act; and such an inquest requiring as it would, the land to be sold and conveyed by the escheator, would cause the land, after remaining, a short time, the property of the State, to pass to the person to whom, the escheator should sell and convey it. Consequently, if the inquest was taken after the Act of 1801, it is to be presumed, that the title had, through the escheator's sale, passed out of the State, before the time of the grant to Vickery; and therefore, that that grant conveyed no title to him.

We think, then, that the Court, instead of charging the jury as it did, should rather have charged them thus:

1st. That even although a person may, under color of title and claim of right, hold another's land for seven years adversely, yet if he then *abandons* the land he has no right to claim benefit under the statute of limitations.

2d. That, although, it might be true, that a grant had been made to Lamentation Braswell in 1788, yet it did not thence follow, that the jury would, of necessity, have to conclude, that the grant made by the State to Vickery, in 1854, was void.

On the contrary, that if neither Braswell, nor any heir of his, nor any will made by him, had ever been heard of, subsequently to the date of his grant, the jury would be authorized if not required, to presume, that the land had by escheat, on due inquest, reverted to the State.

That, making this presumption, they must then determine whether the time of the inquest, was before, or after the Escheat Act of 1801. That if they determined that it was before, they would be bound to conclude, that the inquest was in the common law mode, and therefore, that it had had the effect, to make the land revert to the State, and remain the property of the State until the time of the grant in 1854, to Vickery, and consequently would be bound to conclude, that the land had, by that grant, passed to Vickery.

But, that, if they determined, that the time of the inquest was subsequent to this Escheat Act, they would be bound to conclude, that the inquest was one according to the mode prescribed by that Act, and therefore to conclude that though the land reverted to the State, yet, that it did so, merely to pass again from the State to some purchaser at a sale of the escheator, made according to the provisions of the Act; and consequently, that they would be bound to conclude, that there was no title in the State, at the time of the grant to Vickery, in 1854; and therefore, that no title passed to him by that grant.

The ninth and tenth grounds relate to the conduct of a juror, and it is needless to determine them, as the determination of the two groundss first disposed of, makes a new trial necessary. It is not likely, that such conduct will be imitated. It is equally needless to notice the first four grounds.

New trial granted.